## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT E. WHITEHOUSE,<br><br>    Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER<br>SOCIAL SECURITY ADMINISTRATION,<br><br>    Defendant. | No. 3:13-CV-894 (MPS) |

### MEMORANDUM OF DECISION

### Introduction

Plaintiff Robert E. Whitehouse ("Mr. Whitehouse") brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for social security disability insurance ("SSDI") under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA").  Before me are Mr. Whitehouse's Motion for Order Reversing the Decision of the Commissioner [Doc. #12] (hereinafter "Pl.'s Mot.") and the Commissioner's Motion for an Order Affirming that decision [Doc. #13] (hereinafter "Def.'s Aff.").

Because the Administrative Law Judge ("ALJ") erroneously concluded that Mr. Whitehouse's residual functional capacity ("RFC") permitted Mr. Whitehouse to perform his past relevant work as a lumber straightener and store laborer, I GRANT Mr. Whitehouse's Motion for Order Reversing the Decision of the Commissioner and REMAND for proper evaluation of Mr. Whitehouse's ability to perform past relevant work and, if necessary, any further analysis at Step Five of the evaluation process.  The ALJ need not address Mr. Whitehouse's other challenges on remand, however, as I agree with the Commissioner that (1)

1

the ALJ's findings as to the weight to accord to certain medical opinions are supported by substantial evidence, and (2) the ALJ's description of Mr. Whitehouse's RFC is sufficiently clear.

## Procedural History

Mr. Whitehouse applied for both SSDI and SSI benefits, alleging a disability onset date of December 30, 2008. His claim was denied initially and upon reconsideration. Mr. Whitehouse requested a hearing, which was held on November 23, 2011 before the ALJ. On January 10, 2012, the ALJ issued her decision finding that Mr. Whitehouse was not disabled as defined in the SSA from December 30, 2008, to the date of her decision. Mr. Whitehouse filed this action to appeal that decision.

## Factual Background

The ALJ applied the SSA's five-step sequential evaluation procedure and ultimately found that Mr. Whitehouse was not disabled.[1] At Step One, the ALJ determined that although Mr. Whitehouse had been working after his alleged onset disability date as a part-time janitor and received a small stipend for completing his chores in his housing community, such activity

---

[1] To be considered disabled under the SSA and therefore entitled to benefits, the claimant must demonstrate that he is unable to work "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Such impairment(s) must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). The regulations promulgated by the Commissioner establish a five-step analysis for evaluating disability claims. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds the claimant to be disabled or not disabled in any step in this sequential inquiry, the ALJ's review ends. 20 C.F. R. §§ 404.1520(a), 416.920(a). First, the Commissioner considers if the claimant is presently working in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If not, the Commissioner next considers if the claimant has a medically severe impairment. *Id.* at § 416.920(a)(4)(ii). If the severity requirement is met, the third inquiry is whether the impairment is listed in Appendix 1 of the regulations or is equal to a listed impairment. *Id.* at § 416.920(a)(4)(iii); Part 404, Subpart P, Appendix 1. If it is not, the fourth inquiry is to determine whether, despite the severe impairment, the claimant's residual functional capacity allows him or her to perform any past work. *Id.* at § 416.920(a)(4)(iv). If a claimant demonstrates that no past work can be performed, the burden shifts to the Commissioner, who must provide evidence that there is work in the national economy that the claimant can do. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). If the Commissioner fails to come forward with such evidence, the claimant is entitled to disability benefits.

did not rise to the level of substantial gainful activity.  (ALJ Decision, R. at 113.)  At Step Two, the ALJ found that Mr. Whitehouse had a number of severe impairments: obesity, mild back disorder, substance addiction disorder, and affective disorder.  (*Id*.)  Next, the ALJ found at Step Three that these impairments did not meet or medically equal the severity of one of the listed impairments in the relevant Social Security Regulations.  (*Id*. at 113-14)  Neither party contests any of the ALJ's findings at Steps One through Three.

At Step Four, the ALJ first determined Mr. Whitehouse's RFC, finding that he had:

> the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except lifting and carrying 50 pounds occasionally and 25 pounds frequently, standing and/or walking 6 hours in an 8 hour workday and sitting 2 hours in an 8 hour workday. Furthermore, the claimant is limited to simple repetitive low stress tasks and should have no contact with the general public.  Additionally, the claimant should not be subjected to strict time or production requirements and can only engage in occasional kneeling and bending.  Finally, the claimant should have only brief and superficial interaction with supervisors.

(*Id*. at 115.)  The ALJ concluded that given this RFC, Mr. Whitehouse could return to his past relevant work ("PRW") as either a lumber straightener or a store laborer, both as those jobs are generally performed and as Mr. Whitehouse actually performed them.  (*Id*. at 115-119.)

The ALJ noted that Mr. Whitehouse had testified that he had recently started a part-time janitorial position (three hours a day for three days of the week) and had previously worked as a dock shipper/receiver.  (*Id*. at 115)  Mr. Whitehouse stated that at the latter job he had lifted up to 75 pounds, was on his feet most of the day, and was ultimately terminated because of mental health issues.  (*Id*.)  Mr. Whitehouse said his inability to focus and follow directions, not his physical impairments, precluded him from working, and that he had problems focusing and concentrating.  (*Id*.)  Mr. Whitehouse also testified that he took his medication for anxiety, depression, and alcohol cravings regularly.  (*Id*. at 116.)  He said that he played Bingo once a

week, sometimes socialized with residents in his home, and was able to clean his room and pay his bills.  (*Id*.)

Relying on the medical progress notes from Sound Community Services (where Mr. Whitehouse received ongoing mental health treatment) and Mr. Whitehouse's testimony, the ALJ then found that despite Mr. Whitehouse's "severe mood disorder," his condition had improved and was stable.  (*Id*. at 118.)  Although Mr. Whitehouse had testified his depression left him no longer interested in sports and poetry, and that he had been referred to a partial hospitalization program in May 2010 due to an increase in depressive systems and alcohol abuse, the ALJ found that Mr. Whitehouse more recently maintained an active social life, worked part-time, and was independent in his daily living activities.  (*Id*.)  The ALJ also relied on Sound Community Services' progress notes, which repeatedly stated that through 2009-2010, Mr. Whitehouse had been cleared for work and was pursuing full-time employment.  (*Id*. at 117-18.)

The ALJ also considered the mental assessment provided by Mr. Whitehouse's psychiatrist, Dr. Rama Goyal, and social worker Sherilyn Cartagena at Sound Community Services.  In Dr. Goyal and Ms. Cartagena's December 5, 2011 report, they stated that Mr. Whitehouse was seriously limited in his ability to understand, remember and carry out detailed instructions, work with others without serving as a distraction, and make work-related decisions.  (*Id*. at 118.)  They also opined that Mr. Whitehouse's depression and anxiety caused sleep disturbance, easy distractibility, emotional withdrawal, mood disturbance, and decreased energy; and that Mr. Whitehouse would be absent from work more than four times per month.  (*Id*.)  The ALJ assigned only moderate weight to these assessments, however, because she found portions inconsistent with the record.  (*Id*. at 119.)  Specifically, the ALJ assigned very little weight to their assessment that Mr. Whitehouse would be absent from work four days per month because

while the record showed Mr. Whitehouse had missed work at times due to his depression, such absences were not a pattern.  (*Id.*)  Further, the only time Mr. Whitehouse's absences and mental impairments caused him to lose his job was an occasion on which he was noncompliant with his medication regimen.  (*Id.*)  His progress notes since then indicated he was stable and maintained an active schedule.  (*Id.*)  The ALJ also assigned very little weight to Dr. Goyal and Ms. Cartagena's assessment that Mr. Whitehouse exhibited sleep disturbance because the ALJ found that Mr. Whitehouse's testimony—that he is able to sleep nine or more hours a night and more on weekends—demonstrated he had no sleep problems.  (*Id.*)

As for Mr. Whitehouse's physical impairments, the ALJ discussed multiple medical reports in the record that detailed Mr. Whitehouse's ongoing back pain.  The ALJ assigned little to no weight to the opinion of Dr. Jyothirmayee Korivi, who was Mr. Whitehouse's treating physician.  (*Id.*)  Dr. Korivi opined that Mr. Whitehouse should never climb ladders or scaffolds, crouch or crawl, or be exposed to unprotected heights, moving mechanical parts, humidity, respiratory irritants, extreme temperatures, or vibrations.  (*Id.* at 118.)  Dr. Korivi was unable to identify Mr. Whitehouse's lifting and carrying requirements.  (*Id.*)  The ALJ found Dr. Korivi's opinion unsupported because the record did not substantiate the environmental restrictions listed and instead showed that Mr. Whitehouse was independent in functioning and, among other things, was able to walk to work, clean his room, shop at Wal-Mart, work as a janitor, and lift up to 50 pounds at a time.  (*Id.* at 119.)  The ALJ also gave less weight to Dr. Korivi's report because she had left large portions of her assessment incomplete.  (*Id.*)

Finally, the ALJ credited testimony from Ruth Baruch, the vocational expert, to find that after comparing Mr. Whitehouse's RFC with "the physical and mental demands of this work," Mr. Whitehouse could perform his PRW as a lumber straightener and as a store laborer, both as

5

generally performed and as performed by Mr. Whitehouse.  (*Id*. at 119-120.)  The ALJ added that "[a]lthough the claimant's current part-time position as a janitor does not qualify as past relevant work," the vocational expert had testified that Mr. Whitehouse's RFC allowed him to perform his janitorial job on a full-time basis.  (*Id*. at 119.)

### Analysis

Mr. Whitehouse raises four issues on appeal.  First, he argues that the ALJ erred in finding that Mr. Whitehouse's RFC permits him to return to his PRW as both a lumber straightener and a store laborer.  Second, Mr. Whitehouse argues the ALJ failed to evaluate, without explanation, two of Dr. Goyal's medical opinions.  Third, he contends the ALJ violated the treating physician rule by according inadequate weight to Dr. Goyal's December 5, 2011 opinion.  Finally, Mr. Whitehouse argues the ALJ failed to clarify what she meant by limiting Mr. Whitehouse's RFC to "simple repetitive low stress tasks," and that Mr. Whitehouse's limitations are therefore so unclear that remand is necessary.

## I.    Standard of Review

In reviewing the ALJ's final decision, "a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) (citing reference omitted).  "'Substantial evidence' is less than a preponderance but 'more than a mere scintilla' and as much as 'a reasonable mind might accept as adequate to support a conclusion.'" *Crossman v. Astrue*, 783 F. Supp. 2d 300, 303 (D. Conn. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Under 42 U.S.C. § 405(g), after reviewing the Commissioner's determination, the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming,

modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing."  42 U.S.C. § 405(g).

## II.    Discussion of The Parties' Arguments

### A.  Whether the RFC Ascribed to Mr. Whitehouse Permits Him to Perform His PRW

Mr. Whitehouse contends that the ALJ erred in finding that his PRW fell within the RFC limitations imposed by the ALJ.  Specifically, Mr. Whitehouse argues that the ALJ erred in adopting the vocational expert's testimony and in finding that Mr. Whitehouse could return to his PRW as a lumber straightener and store laborer because those jobs both require capabilities beyond those of Mr. Whitehouse's RFC.  The Commissioner does not defend the ALJ's analysis on this point but maintains instead that any error at Step Four was harmless because the ALJ made an alternate Step Five finding that Mr. Whitehouse could perform his janitorial work full-time.

For purposes of this argument, Mr. Whitehouse does not dispute the ALJ's RFC assessment, although he does so in subsequent arguments.  (*See, e.g.*, Pl.'s Mot. at 20.)  I therefore evaluate Mr. Whitehouse's argument about the findings with respect to his PRW under the assumption that the ALJ correctly determined Mr. Whitehouse's RFC.

At Step Four, the ALJ is required to determine whether, despite the claimant's severe impairment, he has the RFC to perform his PRW as performed nationally and as actually performed.  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); SSR 82-61 (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)).  "This inquiry requires separate evaluations of the previous specific job and the job as it is generally performed."  *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003).  More specifically, "the claimant has the burden to show an inability to return to her previous specific job *and* an inability to perform her past relevant work generally."  *Id.*  In

7

deciding whether the claimant has satisfied this burden, the ALJ is allowed to rely on testimony from a vocational expert.  *See id.* (assessing the ALJ's reliance on vocational expert's testimony at Step Four).

Here, the ALJ found that given Mr. Whitehouse's exertional and nonexertional limitations,[2] his RFC permitted him to perform medium work but limited him to "lifting and carrying 50 pounds occasionally," "simple repetitive low stress tasks," "no contact with the general public," no "strict time or production requirements," "brief and superficial interaction with supervisors," and only "occasional kneeling and bending."  (ALJ Decision, R. at 115.)  The ALJ elicited testimony from the vocational expert and concluded, on the basis of that testimony, that Mr. Whitehouse could perform his past relevant work as a lumber straightener and store laborer.  (R. at 119-20.)  Specifically, the ALJ stated as follows:

> The vocational expert testified that the claimant's past relevant work is described as a lumber straightener, Dictionary of Occupational Titles (DOT) code number 669.687-018, which is medium in exertion and unskilled (SVP 2); and store laborer, which is DOT code number 922.687-058, medium in exertion and unskilled (SVP 2).  She indicated that the claimant could perform these jobs as generally performed and as performed by the claimant pursuant to his testimony.
>
> Although the claimant's current part-time position as a janitor does not qualify as past relevant work, given his residual functional capacity, the vocational expert testified that he could perform this job on a full time and sustained basis as generally performed.  This position is DOT code number 381.687-018, which is medium in exertion and unskilled (SVP 2).

---

[2] Exertional limitations affect the ability to meet the strength demands of jobs.  20 C.F.R. § 416.969a(a). Nonexertional limitations are "limitations and restrictions imposed by . . . impairment(s) and related symptoms, such as pain, [that] affect only [the] ability to meet the demands of the jobs other than the strength demands."  *Id*. § 416.969a(c).  These include limitations such as anxiety, depression, difficulty maintaining attention or concentration, difficulty understanding or remembering detailed instructions and "difficulty performing the manipulative or postural functions of some work such as reading, handling, stooping, climbing, crawling, or crouching."  *Id*. § 416.969a(c)(i)-(vi).

> In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as actually and generally performed.

(R 119-20.)  This portion of the ALJ's decision suffers from three problems.  First, it misstates the vocational expert's testimony, which, though somewhat unclear, suggests that the expert did not find Mr. Whitehouse capable of performing his PRW as he actually performed it.  Second, it fails to square the limitations of Mr. Whitehouse's RFC with the requirements of his PRW, both as that work was actually performed by Mr. Whitehouse, according to his testimony, and as performed in the national economy, as described in the DOT and its companion text, the Selected Characteristics of Occupation ("SCO").  Third, it glosses over inconsistencies between the vocational expert's testimony and the DOT/SCO.  These errors require remand.

### 1.   The Vocational Expert's Testimony

In her decision, the ALJ stated that the vocational expert had testified "that the claimant could perform [his PRW of a lumber straightener and store laborer] as generally performed and as performed by the claimant pursuant to his testimony."  (R. at 119.)  Although at times imprecise, the vocational expert's testimony is clear enough to show that she testified only that Mr. Whitehouse could perform his PRW as generally performed, not, as the ALJ stated, as Mr. Whitehouse actually performed it.

The exchanges between the ALJ and vocational expert support this conclusion.  The first of two hypotheticals the ALJ posed to the vocational expert was as follows:

> Q:   Please assume the person who has the claimant's age, education and work experience with the following limitations; can lift and carry 50 pounds occasionally, 25 pounds frequently, stand or walk six hours in an eight hour period, sit for six hours in an eight hour period, follow and perform simple repetitive tasks and has no contact with the general public.  Could such a person perform the claimant's past relevant work either as he actually performed it, or as

those occupations are generally performed in the national economy?

A:     Based on your hypothetical, I would say that he could perform the work as the janitor as it's generally performed. He could perform the warehouse worker [i.e., DOT number 922.687-058, also known as a store laborer] and the laborer in the saw mill [i.e., DOT number 669.687-018, also known as a lumber straightener] as well; as performed, not as he testified.

Q:     Okay. I'm sorry, not as he testified?

A:     No, because he testified in the saw mill; when he was working in the saw mill to lifting 85 pounds, and you're saying this is a medium hypothetical.

Q:     Okay. So the question is, either as he performed it or as occupations are generally performed in –

A:     Oh, I mean as performed in the DOT. I'm sorry.

Q:     Okay. So, could such a person perform the claimant's past relevant work either as he actually performed it or as those occupations are generally performed in the national economy?

A:     As performed in the national economy, he could do the work of the warehouse worker and the saw mill; as performed in the national economy.

(R. at 45-46.) The ALJ then continued to her second hypothetical:

Q:     Okay. For a second hypothetical, please assume the following limitations *in addition to* those listed in hypothetical one; stand or walk for seven hours, sit for three to four hours in an eight hour day, no strict time or production requirements, occasional kneeling or bending, and brief and superficial contact with supervisors. Could such a person perform the claimant's past relevant work either as he actually performed it or as those occupations are generally performed in the national economy?

A:     I would say that based on that he could perform his work *as was performed*.

(R. at 46-47.) (emphasis added).   Although the vocational expert's last statement—that Mr. Whitehouse could perform his PRW "as was performed"—is somewhat unclear when read by itself, the context of this statement shows that the vocational expert could have only meant it "as was performed generally in the national economy."

In particular, the first hypothetical limited Mr. Whitehouse to lifting and carrying 50 pounds occasionally and 25 pounds frequently.  (R. at 45.)  In response, the vocational expert stated that given this weight limitation, Mr. Whitehouse would not be able to perform his PRW as it was actually performed because he had testified he carried more than 50 pounds at his prior jobs.  (R. at 46.)[3]  In response to the second hypothetical, which posed *additional* limitations and maintained the 50/25 pound weight limitation, the vocational expert could not logically and consistently have answered that Mr. Whitehouse could perform his PRW as actually performed and carry more than that weight; to do so would be to contradict her answer to the first hypothetical and to provide an opinion that was not supported by the evidence.  Thus, the only interpretation of the vocational expert's "as was performed" response that is consistent with the record as a whole is that she was providing her opinion that Mr. Whitehouse could perform the job "as was performed generally in the national economy."  The ALJ's interpretation, which

---

[3] The vocational expert was correct in stating that Mr. Whitehouse had testified that his performance of his PRW required him to lift more than 50 pounds occasionally and 25 pounds frequently.  Specifically, when describing his duties as a store laborer, Mr. Whitehouse testified:

> Q:      But how much did you have to lift at any one time [as a store laborer]?
> A:      How much did I lift at any time?  Seventy-five pounds.

(R. at 19.)  Similarly, when discussing his duties when he was a lumber straightener, Mr. Whitehouse testified:

> Q:      And how much did you have to lift?
> A:      Between 50 and 85 pounds.

(R. at 20.)

asserts that the vocational expert found that Mr. Whitehouse could perform his past work both as he actually performed it and as was performed in the national economy, is incorrect.

**2.   The ALJ Failed to Square the Limitations of Mr. Whitehouse's RFC with his PRW**

The ALJ's decision also failed to accord Mr. Whitehouse's RFC with the requirements of his PRW, both as that work is generally performed in the DOT and as it was actually performed by Mr. Whitehouse, according to his own testimony.

First, there are clear conflicts between the DOT/SCO descriptions for Mr. Whitehouse's PRW and the ALJ's finding that Mr. Whitehouse can return to such jobs as they are generally performed in the national economy.   Mr. Whitehouse correctly argues that under the SCO, a store laborer has postural demands that exceed his RFC.   (Pl.'s Mot. at 18.)   For example, the ALJ specifically limited Mr. Whitehouse to only occasional bending, yet a store laborer is required to stoop and crouch frequently.   SCO at 95.   The SCO's definitions of both these activities clearly include bending:   "Stooping" is the "[b]ending body downward and forward by bending spine at the waist, requiring full use of the lower extremities and back muscles" and "Crouching" is the "[b]ending body downward and forward by bending legs and spine."   SCO at Appx. C-3.   Because the ALJ limited Mr. Whitehouse to only occasional bending, she incorrectly concluded that he could perform his PRW as a store laborer as performed nationally.

The ALJ also does not explain how Mr. Whitehouse could perform the duties listed by the DOT for a store laborer or lumber straightener that entail timely pace and production requirements.   Without such an explanation, there is no basis to discern whether such duties— which conflict with Mr. Whitehouse's RFC—could be performed by Mr. Whitehouse.   For example, the DOT description for a store laborer includes duties such as accepting shipments, distributing items, and filling orders (*see* DOT 922.687-058), and the description for a lumber

straightener includes tending an automatic conveyer and sorting machine, clearing jammed material along a conveyer, and straightening lumber on a conveyer (*see* DOT 669.687-018).  The ALJ does not reconcile how such tasks accord with her RFC assessment that Mr. Whitehouse be subjected to "no strict time or production requirements."  (ALJ Decision, R. at 115.)  In addition, the ALJ did not explain why either job would be appropriate even though she limited Mr. Whitehouse to no contact with the general public and only brief and superficial interaction with supervisors.  In response to these arguments by Mr. Whitehouse, the Commissioner failed to explain why these jobs are nonetheless appropriate for Mr. Whitehouse given his RFC.

The ALJ also concluded that Mr. Whitehouse could perform his PRW as it was actually performed.  As shown, this finding conflicts with both the vocational expert's testimony and Mr. Whitehouse's own testimony as to how he actually performed his PRW.  (R. at 19-20; *see also supra* note 3.)

### 3.  The ALJ Failed to Identify and Resolve Inconsistencies Between the Vocational Expert's Testimony and the DOT/SCO

The ALJ also erred in her Step Four finding by failing to identify and reconcile the conflict between the vocational expert's testimony and the DOT/SCO.  At the end of her questioning of the vocational expert, the ALJ asked:

> Q:  Okay, and is your testimony consistent with the Dictionary of Occupational Titles and the selected characteristics of occupations?
>
> A:  Yes, your honor.
>
> Q:  Are there any inconsistencies between the evidence you provided and the DOT or the SCL [sic]?
>
> A:  No.

(R. at 48.)  The ALJ then relied on the vocational expert's testimony without any discussion of whether the expert's testimony was inconsistent with the DOT/SCO.

As discussed in Section II.A.2 herein, there are a number of conflicts between Mr. Whitehouse's PRW and the DOT/SCO requirements for those jobs.  Although the vocational expert did not identify these conflicts before concluding that Mr. Whitehouse could perform his PRW as generally performed, the Social Security regulations make clear that the ALJ was nonetheless required to identify and resolve those conflicts herself before relying on the expert's testimony.  In particular, Social Security Ruling 00-4p, which is binding on all proceedings, 20 C.F.R. § 402.35(b)(1), provides:

> In particular, this ruling emphasizes that before relying on VE or VS evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), published by the Department of Labor, and Explain in the determination or decision how any conflict that has been identified was resolved.
>
> . . .
>
> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

*Policy Interpretation Ruling: Titles II and XVI: Use of a Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions*, SSR-00-4P, 2000 WL 1898704 (Dec. 4, 2000); *Jasinski*, 341 F.3d at 184 (recognizing that there is

conflict when vocational expert and DOT disagree in describing requirements of a job as it is performed in the national economy).

The Social Security Regulations thus place an affirmative duty on the ALJ to identify and resolve any conflict between the vocational expert's testimony and the DOT/SCO before relying on such testimony, "irrespective of how the conflict was identified." *Id*. Here, the ALJ did not identify the conflict between the vocational expert's testimony—that Mr. Whitehouse could perform his PRW as it is generally performed—and the information in the DOT/SCO, which includes job requirements exceeding Mr. Whitehouse's RFC. Nor did the ALJ resolve such conflicts in her decision. The ALJ's catch-all question to the vocational expert regarding any inconsistencies between the expert's testimony and the DOT/SCO—which, as shown, the vocational expert appears to have answered incorrectly—does not satisfy the ALJ's duty to identify, explain, and resolve the conflicts between the expert's testimony and her decision. *See Diaz v. Astrue*, No. 11-317, 2012 WL 3854958, at *6 (D. Conn. Sept. 5, 2012) ("SSR 004-p requires the ALJ to afford no room for conjecture where there is an apparent conflict between the VE's testimony and the DOT and a resolution by this Court would be unduly conjectural in the absence of clarification from the ALJ.").

### 4. The Commissioner's Step Five Argument

As mentioned, the Commissioner does not attempt to rebut Mr. Whitehouse's arguments that the ALJ erred in her Step Four analysis. Instead, the Commissioner argues that even if there were such error, the ALJ made an alternative Step Five conclusion that Mr. Whitehouse could perform his part-time janitorial work full-time. (Def.'s Aff. at 15.)

The Commissioner's argument is unconvincing. First, under the sequential evaluation required in disability cases, the Social Security regulations make clear that the ALJ would not

have proceeded to a Step Five analysis once she determined that Mr. Whitehouse was not disabled under Step Four. *See* 20 C.F.R. § 416.920(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step."); *see also* (ALJ Decision, R. at 111) ("The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step."). The ALJ does not state that she is departing from these requirements by making a Step Five finding, and the record does not provide any evidence indicating that she meant to. Further, the context of the ALJ's discussion of the janitor position—which begins with "[a]lthough the claimant's current-part time position as janitor does not qualify as past relevant work" and appears under a heading titled "[t]he claimant is capable of performing past relevant work" (ALJ Decision, R. at 119)—as well as the discussion of that position at the hearing[4]—confirms that the ALJ was focused on Step Four.

Even if I were to construe the ALJ's comment about Mr. Whitehouse's ability to work as a janitor as a Step Five finding, I would find that it was a flawed Step Five finding, because the Commissioner would have failed to satisfy her burden of proof at Step Five. Although the claimant bears the burden to prove his disability, the burden shifts at Step Five to the Commissioner to provide evidence that the claimant is able to perform other work existing in significant numbers in the national economy. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). Nothing in the decision suggests that the ALJ made any attempt to satisfy this burden, either through use of the SSA's table of medical-vocational guidelines or by eliciting testimony from the vocational expert about the number of janitorial jobs in the national economy. *See*

---

[4] The vocational expert only brought up Mr. Whitehouse's janitorial position when discussing his PRW. For example, when initially identifying Mr. Whitehouse's PRW, the vocational expert mentions his janitorial work and states "I don't know if you would consider that substantial gainful, but the DOT code for that is 381.687-018." (R. at 44.) She later discusses Mr. Whitehouse's janitorial work when evaluating whether it would be PRW that he could perform. (R. at 46-47.)

*Rosa*, 168 F.3d at 78 (discussing when the table—or "grids"—may be used); *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986) (holding that if nonexertional limitations are significant, "then the ALJ should require the Secretary to present either the testimony of a vocational expert or other similar evidence regarding the existence of jobs in the national economy for an individual with claimant's limitations."). This is undoubtedly because, contrary to the Commissioner's argument, the ALJ's comments about the janitorial job were not intended as a Step Five analysis.

*       *       *       *       *       *       *

Because I find that the ALJ erred in finding at Step Four that Mr. Whitehouse may resume his PRW given his RFC, I REMAND for further proceedings.

**B.  Dr. Goyal's August 2010 and November 2010 Opinions**

Mr. Whitehouse next argues that the ALJ erred in ignoring, without explanation, two of the medical opinions of Dr. Goyal dated August 2010 and November 2010.  The Social Security Regulations state that "in determining whether you are disabled, we will always consider the medical opinions in your case together with the rest of the evidence we receive."  20 C.F.R. §§ 404.1527(b), 416.927(b).  If the ALJ fails to explicitly consider the medical conclusions of a treating physician—and either give them controlling weight or give good reasons for discounting them—remand  is generally required for consideration of the improperly excluded evidence, "at least where the unconsidered evidence is significantly more favorable to the claimant than the evidence considered."  *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).  Remand is unnecessary, however, where application of the correct legal standard could lead only to the same conclusion.  *Id*.

The Commissioner argues that the ALJ need not have considered Dr. Goyal a treating physician when the August 2010 and November 2010 reports were created because Dr. Goyal

merely co-signed the August 2010 opinion with nurse practitioner Ms. Pamela delPozo-Waldron, and Dr. Goyal's name does not appear on any treatment note in the record until July 2011. (Def.'s Aff. at 5-7.)  There is no suggestion in her decision, however, that the ALJ declined to consider the August and November 2010 opinions on the ground that she did not view Dr. Goyal as a treating physician when those opinions were issued.  I therefore agree with Mr. Whitehouse that the Commissioner's arguments constitute improper *post hoc* rationalization of the ALJ's reasoning that I may not consider.  *Sec. & Exch. Comm'n v. Chenery*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").[5]

Nonetheless, because I find nothing in either the August 2010 opinion or the November 2010 opinion that would be "significantly more favorable" to Mr. Whitehouse than Dr. Goyal's December 2011 opinion that the ALJ did expressly weigh in her analysis, I conclude that the ALJ need not address this issue on remand.  With regard to the August 2010 opinion, Mr.

---

[5] In her Sur-Reply [Dkt. #17], the Commissioner veers off track by asserting that *Chenery* stands for the reverse proposition, i.e., that this Court may affirm even if the ALJ's decision was based on faulty reasoning, just as an appellate court could affirm an incorrectly reasoned decision of a trial court that reached the correct result.  (Def.'s Sur-Reply, at 2.)  The Commissioner's brief quotes a snippet from *Chenery* concerning judicial review of lower court decisions that, when read in context, makes clear that the Court was *distinguishing* such review from the more limited judicial review applicable to decisions of administrative agencies.  *Compare* Def.'s Sur-Reply, at 2 ("Plaintiff has established no basis for remand, in light of the Supreme Court's 'settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason.'" (quoting *Chenery*, 318 U.S. at 88)), *with Chenery*, 318 U.S. at 87-88 ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.  In confining our review to a judgment upon the validity of the grounds upon which the Commission itself based its action, we do not disturb the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason. The reason for this rule is obvious.  It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate. But it is also familiar appellate procedure that where the correctness of the lower court's decision depends upon a determination of fact which only a jury could make but which has not been made, the appellate court cannot take the place of the jury. Like considerations govern review of administrative orders. If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment. For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency." (internal quotation marks and citation omitted)).

Whitehouse does not point to anything in that opinion that would be significantly more favorable than the other evidence considered by the ALJ.  The August 2010 opinion states that Mr. Whitehouse had either "no problem" or "a slight problem" in all of his daily living activities, "no problem" with his social interaction except for "an obvious problem" asking questions or seeking assistance, and had few "obvious problems" but no "serious problem" regarding task performance.  (R. at 284-86.)  Unlike Dr. Goyal's December 2011 opinion, the August 2010 opinion provides no discussion regarding the number of days Mr. Whitehouse might miss work or opine on his employment ability.

As for the November 2010 co-signed by Dr. Goyal and Ms. Cartagena, the ALJ *does* mention this opinion and its findings in determining Mr. Whitehouse's RFC.  (*See* ALJ Decision, R. at 117.)  Although the ALJ did not "explicitly" discuss the weight she assigned to this opinion, *see Crossman*, 783 F. Supp. 2d at 308, any failure to do so was harmless because the November 2010 opinion is also not "significantly more favorable" than the December 2011 opinion.  The main difference between the November 2010 and December 2011 reports is that the December 2011 report provides substantially greater detail as to Mr. Whitehouse's restrictions and ability to do work.  For example, the two reports list the same medications for Mr. Whitehouse and the same diagnoses, except that the December 2011 report also includes back problems.  (*See* R. at 429, 1102.)  The December 2011 report also includes Dr. Goyal's opinion as to how often Mr. Whitehouse will be absent from work due to his impairment.  (R. at 1106.)

Where the two reports do overlap in assessment, there is nothing significantly more favorable in the November 2010 report.  For instance, the November 2010 report states Mr. Whitehouse has a very serious problem with carrying out single-step and multi-step instructions,

performing work activity on a sustained basis, handling frustration properly, and focusing long enough to finish simple activities and tasks. (R. at 431.) Similarly, the December 2011 report states Mr. Whitehouse is seriously limited, but not precluded, in making simple work-related decisions, understanding and remembering detailed instructions, carrying out detailed instructions, performing at a consistent pace without an unreasonable number and length of rest periods, dealing with normal work stress, and completing a normal workday and workweek without interruption from psychologically based symptoms. (R. at 1104-05.) The December 2011 further elaborates that Mr. Whitehouse has "very limited employment expectations" and lists a number of Mr. Whitehouse's signs and symptoms not listed in the November 2010 report, such as sleep disturbance, poverty of content of speech, mood disturbance, psychomotor agitation or retardation, apprehensive expectation, and memory impairment. (R. at 1102-03.) At times, the December 2011 report provides an even bleaker assessment of Mr. Whitehouse's capabilities than the November 2010 report. For example, while the November 2010 report states that Mr. Whitehouse has no problem getting along with others without distracting them or exhibiting behavioral extremes, the December 2011 report states that Mr. Whitehouse has only a limited, but satisfactory, ability to do so. (R. at 431, 1104.) Thus, while the two reports are not identical, the November 2010 report is not significantly more favorable to Mr. Whitehouse than the December 2011 report.

In sum, on remand, the ALJ need not consider (or weigh more explicitly) either Dr. Goyal's August 2010 report or November 2010 report because neither is significantly more favorable to Mr. Whitehouse than the December 2011 report that the ALJ did explicitly consider and weigh.

**C.     The Weight Accorded to Dr. Goyal's Opinion**

Mr. Whitehouse argues that the ALJ failed to provide adequate weight to Dr. Goyal's December 2011 opinion, thereby violating the "treating physician rule."  The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence.  *Rosa*, 168 F.3d at 78-79.  In analyzing a treating physician's report, the ALJ cannot arbitrarily substitute her own judgment for competent medical opinion.  *Id*. at 79.  Before discrediting the medical conclusions of a treating physician, the ALJ must explicitly consider several factors, including: (1) the frequency of examination and length, nature, and extent of the treatment relationship; (2) evidence in support of the physician's opinion; (3) consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist, and (5) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.  *Crossman*, 783 F. Supp. 2d at 308 (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).

Mr. Whitehouse argues that the ALJ's "only criticism" of the report was that it was inconsistent with the record, "but she did not elaborate beyond this conclusion."  (Pl.'s Mot. at 23.)  He is incorrect.  The ALJ clearly stated she assigned moderate weight to the opinion because *portions* of it are inconsistent with the record.  (ALJ Decision, R. at 119.)  In the same paragraph, the ALJ explained which portions of the assessment to which she gave less weight and why.  She clarified that she assigned "very light weight" to the assessment that Mr. Whitehouse exhibits sleep disturbance and would be absent from work four days per month, because the record shows Mr. Whitehouse's work absences are not a pattern and in the past have occurred when he is off his medication.  (*Id*.)  The ALJ also relied on evidence in the record showing that Mr. Whitehouse is now stable and maintains a very active daily schedule, going to work on time and often early to prepare for his tasks.  (*Id*.)

There is substantial evidence to support the ALJ's assignment of moderate weight to Dr. Goyal's December 2011 report and very light weight to the report's findings that Mr. Whitehouse exhibits sleep disturbance and may miss four days of work per month.  First, the record provides substantial evidence that Mr. Whitehouse's absences from work are not a pattern.  Progress notes from Sound Community Services consistently report Mr. Whitehouse as "stable" and "doing well" while on his medication.  (*See, e.g.*, R. at 650 ("Patient states he's doing better on the medications . . . eating & sleeping well"); R. at 704 ("He reports he is much improved now that is back on [his medications]. He now reports a stable mood without the mood swings and is better able to concentrate."); R. at 998 (describing patient as stable and that "he remembers what non compliant [sic] cost him; no intention of going off meds").)

In addition, the record includes substantial evidence rebutting Dr. Goyal's assessment that Mr. Whitehouse exhibits sleep disturbance.  Progress notes for Mr. Whitehouse from Sound Community Services regularly state that he sleeps well and often elaborate that when Mr. Whitehouse does tend to sleep longer than usual, it is usually due to boredom from unemployment.  (*See, e.g.*, R. at 1044 ("Sleeping well[,] energy level is intact, likes to sleep late on the weekends as there is nothing else to do[,] taking his meds as prescribed and finds them helpful."); R. at 1010 (noting that when Mr. Whitehouse is job searching and attending activities, he "sleeps okay, not too much");  R. at 990 (same, stating that "He is enjoying it, and not 'sleeping all day' . . . sleeping a regular amount of time now"); R. at 922 ("Sleeps well but too much 12 – 13 hours a day, but says it is mostly related to boredom."); R. at 976 ("[R]eports still sleeping most of the weekend; due to boredom").)  The record therefore contains substantial evidence supporting the ALJ's decision to reject Dr. Goyal's assessment that Mr. Whitehouse may exhibit sleep disturbance that will cause him to miss work, or that working triggers Mr.

Whitehouse's sleep disturbance.  Instead, it suggests that Mr. Whitehouse's extra sleep is caused by an *absence* of work, not its presence.

Further support for the ALJ's assigned weight to Dr. Goyal's report is the substantial evidence in the record supporting the ALJ's finding that Mr. Whitehouse maintains an active schedule.   At his administrative hearing, Mr. Whitehouse testified that he took public transportation (R. at 17), performed part-time janitorial work (R. at 18), checked his email and handled online banking (R. at 26), attended group events at his group home approximately three nights per week (R. at 26), performed a variety of household chores (R. at 28), was able to walk up and down a hill (R. at 27), and goes to Wal-Mart and AA meetings, the latter as regularly as once a week (R. at 29).  The record also shows that Mr. Whitehouse socializes about an hour per day (R. at 267) and sometimes rides a bicycle (R. at 269).   Mr. Whitehouse's argument that the ALJ "cherry-picked" irrelevant facts to discount Dr. Goyal's findings is therefore unsubstantiated because there is substantial evidence in the record to support the ALJ's conclusion.  Although the ALJ's decision does not cite each item of evidence listed above, the ALJ is also not required to cite every piece of evidence in the record that supports her decision. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 2012) ("When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."). Because the discounted portions of Dr. Goyal's findings are inconsistent with substantial evidence in the record, I reject this claim of error.

**D.  The ALJ's Finding that Mr. Whitehouse's RFC Limits Him to Low Stress Tasks**

Mr. Whitehouse's final argument is that the ALJ failed to clarify what she meant by limiting Mr. Whitehouse to "low stress tasks," and because that limitation is so "vague," it is "impossible" to determine its impact on Mr. Whitehouse's RFC.  (Pl.'s Mot. at 25.)

Mr. Whitehouse's argument is without merit, and the ALJ need not address this issue on remand.  The ALJ did clarify what she meant by low stress tasks by specifically limiting Mr. Whitehouse's RFC to "no contact with the general public," no "strict time or production requirements," and "only brief and superficial interaction with supervisors."  (ALJ Decision, R. at 115.)  Although Mr. Whitehouse argues the ALJ's low stress finding does not specify "the precise extent of [Mr. Whitehouse's] mental limitations," (Pl.'s Mot. at 25), the ALJ's additional limitations specify just that.  Further, the ALJ did not, contrary to what Mr. Whitehouse alleges, pose hypotheticals to the vocational expert that included only a "vague reference" to low stress (*See* Pl.'s Mot. at 26); instead, the ALJ specifically asked whether a claimant who had, among other limitations, only brief and superficial contact with supervisors, no strict time or production requirements, no contact with the general public, and can only perform simple repetitive tasks would be able to perform the jobs discussed.  (R. at 45-47.)  These hypotheticals entail much more than a "vague reference" to low stress—they include the details of Mr. Whitehouse's RFC.  Contrary to Mr. Whitehouse's argument, the vocational expert did have notice of Mr. Whitehouse's "degree of limitation" and his precise stress-related limitations in the workplace.  I therefore find no error in the ALJ's determination as to this issue.

## Conclusion

For the foregoing reasons, I GRANT Mr. Whitehouse's Motion to Reverse, DENY the Commissioner's Motion to Affirm, and REMAND for further administrative proceedings consistent with this opinion.

IT IS SO ORDERED.


    /s/
_____
Michael P. Shea, U.S.D.J.


Dated:      Hartford, Connecticut
             September 19, 2014